UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
UNITED STATES OF AMERICA,               :      S3 04 Cr. 1110
                                        :           (DLC)
            -v-                         :
                                        :      OPINION & ORDER
LJUSA NUCULOVIC,                        :
                        Defendant.      :
                                        :
----------------------------------------X

Appearances:

For the Government:
Timothy J. Treanor
Jennifer G. Rodgers
Benjamin Gruenstein
Assistant United States Attorneys
United States Attorney's Office for the
Southern District of New York
One St. Andrew's Plaza
New York, NY 10007

For the Defendant:
John Burke
26 Court Street, Suite 2805
Brooklyn, NY 11242

DENISE COTE, District Judge:

    Defendant Ljusa Nuculovic ("Nuculovic") has brought a

motion for a new trial pursuant to Rule 33, Fed. R. Crim. P., on

the ground that his trial counsel was ineffective.  Among the

most serious charges, Nuculovic contends that his attorney

Robert Koppelman ("Koppelman") slept during the trial.  For the

following reasons, the motion is denied.

Background

Nuculovic was indicted on October 6, 2004, along with more than a score of co-defendants in a multi-count indictment arising from the Government's investigation of an Albanian organized crime family (the "Organization") in New York City. The defendants included the leaders of the Organization, members of the Organization who provided enforcement and other services, and individuals who ran individual gambling clubs that sent a significant stream of cash to the Organization's leaders.

Six defendants, representing the leadership of the Organization and their core employees, were tried in a three and a half month trial that ran from September 26, 2005, to January 4, 2006. The defendants at trial were Alex Rudaj ("Rudaj") and Nardino Colotti ("Colotti"), who headed the Organization; Nikola Dedaj ("Dedaj"); Prenka Ivezaj ("Ivezaj"); Angelo DiPietro ("DiPietro"); and Nuculovic. Nuculovic, who is Rudaj's cousin, had run the Organization's gambling operations in Queens for several years until he had a falling out with Rudaj.

Each of the six defendants was convicted of substantive and conspiracy RICO charges, in violation of 18 U.S.C. § 1962; substantive and conspiracy gambling charges, in violation of 18 U.S.C. §§ 1955 and 371; and brandishing a firearm in furtherance of the substantive RICO crime, in violation of 18 U.S.C. § 924(c). Nuculovic was also convicted with four of his co-

defendants of an extortion conspiracy, in violation of 18 U.S.C. § 1951, in connection with the Organization's efforts to place a gambling machine in a Queens bar called the Cosmos bar.[1]

The RICO predicate acts that named Nuculovic which the jury found that the Government had proven included an extortion of Fotios Dimopoulos ("Dimopoulos"), who controlled gambling in Queens for the Luchese crime family before the Organization drove it out, and his associate Antonios Balampanis ("Balampanis"); an extortion at a gambling club known as Soccer Fever, an event that was critical to the Organization's defense of its Queens gambling territory from an incursion effort by the Gambino crime family; Nuculovic's extortionate debt collection from Mikhail Hirakis ("Hirakis"), a gambler who became a Government informant after Nuculovic threatened him; and the extortion at the Cosmos bar.

The jury acquitted the defendants on four charges: three racketeering acts and a substantive crime. Each of the six defendants was acquitted of the charge that they had assaulted Hirakis in aid of racketeering. With respect to the racketeering acts, the jury found that the Government had not proven that two defendants (Rudaj and Colotti) attempted to murder a criminal associate, Gaetano Peduto; that Nuculovic had

---

[1] Various combinations of the other defendants were convicted of assault in aid of racketeering, extortion, extortionate debt collection, and bank fraud.

committed extortion at a nightclub known as the Grecian Cave;
and that Nuculovic had made an extortionate extension of credit
in the amount of $10,000.

The Government's evidence at trial included intercepted
Title III recordings of telephone conversations, consensual tape
recordings made by two trial witnesses who dealt extensively
with Nuculovic:  Hirakis and Nicos Kyprianou("Kyprianou")[2];
victim testimony; surveillance testimony and photographs; seized
gambling machines, gambling paraphernalia, and documents; and
with respect to Nuculovic alone, his statements to law
enforcement officers after his falling out with Rudaj and just
prior to his arrest.[3]  Because of its importance to the analysis
of the legal issues raised by Nuculovic's Rule 33 motion, the
trial evidence for the principal crimes on which Nuculovic was
convicted is described in some detail.

---

[2] Kyprianou was cooperating with the Government in the hope of
obtaining a 5K1.1 letter at the time of sentence in the Eastern
District of New York.  See U.S.S.G. § 5K1.1.  After he began
cooperating, Kyprianou met the defendants for the first time
while spending time at Greek gambling establishments.  Nuculovic
and Rudaj both spoke at length with him while he was wearing
recording equipment.  In addition, Ivezaj was recorded by
Kyprianou.

[3] An FBI agent presented a redacted version of the Nuculovic
statements at trial to protect the rights of his co-defendants.
See, e.g., United States v. Chen, 393 F.3d 139, 148 (2d Cir.
2004).

1.  The Organization

     The evidence at trial showed that Rudaj and Colotti were the leaders of the Organization.  Rudaj ran the Organization's gambling operation; Colotti was the Organization's liaison with Italian organized crime.  Dedaj, an extremely violent and dangerous member of the Organization, was the third most important person in the leadership structure.  He was in charge of loansharking and debt collection, and helped collect gambling proceeds weekly from establishments that had agreed to accept the Organization's illegal gambling machines.  Ivezaj supervised gambling clubs, provided protection services for bars and restaurants where the Organization's gambling machines were installed, and with the other leaders of the Organization helped to intimidate rivals and coerce victims.  DiPietro ran a gambling operation for the Organization and provided additional "muscle" when requested.

     Nuculovic was an inveterate gambler and, as mentioned above, a relative of Rudaj.  Rudaj and Colotti had already established a strong presence for their Organization in the Bronx and Westchester, and Nuculovic convinced Rudaj that he should expand his activities into the Astoria section of Queens and supplant the Luchese family, who controlled illegal gambling in that section of New York City.

Nuculovic described the Organization's entry into Astoria during his pre-arrest conversations with federal agents. Realizing that federal law enforcement officers were surveilling his organization's activities, and fearing that arrests were imminent, in September 2004, Nuculovic reached out to and met with FBI agents, offering to work as an informant in exchange for being allowed to remain on the street. He described himself as a degenerate gambler who had controlled gambling in Astoria for an organization.[4] He said that the leaders of his organization believed that they were creating a sixth organized crime family in New York City.

Nuculovic reported that he had joined the organization about four years earlier and that the organization had taken over the gambling clubs and gambling interests in Astoria, Queens from the Luchese crime family. To earn the respect of Greek gamblers, he explained that it was essential that the organization control the Greek dice game barbout and it did. Because he needed the organization's support to install gambling machines in gambling clubs in Astoria, he split the proceeds that he received from the machines and from the barbout game with the organization's leaders "fifty/fifty." According to

---

[4] Because of redactions made to protect the rights of co-defendants, the FBI agent who testified to Nuculovic's statement did not identify the organization as the one headed by Rudaj and Colotti.

Nuculovic, he remained in charge of Astoria for the organization until early 2004.

Nuculovic's statement was entirely consistent with the other evidence received at trial.  As that evidence showed, the Organization's entry into Astoria began with an act of violence, charged as Racketeering Act 4 and charged as well in Count Thirteen.


2.  Count Thirteen and Racketeering Act 4:  Extortion of Dimopoulos and Balampanis

Racketeering Act 4 charged that all of the defendants on trial except Colotti participated in the extortion of Dimopoulos and Balampanis.[5]  Count Thirteen charged all of the defendants with possessing a firearm in furtherance of the RICO crime charged in Count One of the indictment on at least one of three occasions.[6]  One of those occasions was the attack on Balampanis in connection with the extortion charged in Racketeering Act 4.

---

[5] The jury was presented with a redacted Indictment at the time of its deliberations.  The references in this Opinion are to the counts as they were numbered in that redacted Indictment.

[6] Count Thirteen charged a violation of 18 U.S.C. § 924(c) through the use, carrying or possession of a firearm in furtherance of the RICO substantive offense charged in Count One of the Indictment.  The jury was charged that they had to be in unanimous agreement that a defendant had acted in that way on at least one of three specific occasions in order to convict a defendant.  All six defendants were charged with this firearms offense in connection with the August 2001 Soccer Fever incident, all defendants except Colotti were so charged in

As mentioned, Dimopoulos supervised the illegal gambling operations in Queens for the Luchese crime family until the Organization took over the operations in 2001.  In order to send a message that the Organization was taking over those operations, Rudaj and his associates attacked Dimopoulos' associate Balampanis in June 2001.  At that time, Balampanis was at a Greek gambling club known as Stamatis.  Nuculovic went to the club and lured Balampanis to a stairwell in a neighboring building where Rudaj and others were waiting.  In that small, cramped stairwell, they beat Balampanis ferociously.  Dimopoulos got the message, he stayed away from Queens, and the Organization successfully took over gambling in Astoria from the Luchese crime family.

The evidence concerning this incident came from Balampanis, who described Nuculovic's role and his beating; Balampanis' medical records, which reflected that Balampanis believed he had been pistol whipped; and Maurizio Sanginiti, who had driven some of the defendants to the scene, was waiting outside in a car during the beating, and heard Ivezaj and DePietro describe the attack moments after it had occurred.  In addition, the jury

---

connection with the June 2001 extortion of Dimopoulos and Balampanis, and Nuculovic was so charged in connection with the August 2001 extortion at the Grecian Cave.  All six defendants were convicted on Count Thirteen.

heard descriptions from Nuculovic and Rudaj of these events through the consensual tape recordings made by Kyprianou.

On October 1, 2003, Nuculovic explained to Kyprianou that Dimopoulos had been his friend for years, and that Nuculovic had offered to let him stay involved in the barbout game on the condition that he sever his ties with the Italians and join the Albanian Organization, which was coming from the Bronx to take over gambling in Queens.  When Dimopoulos' friend Balampanis, whom Nuculovic described as an "Albanian, from Greece", broke some of the Organization's gambling machines, he was beaten.

In a recorded conversation that began on April 15, 2004,[7] Rudaj described to Kyprianou how he had taken over Astoria.  He said that Balampanis was an Albanian who spoke Greek and who "caught a beating" because of his connection to Dimopoulos. After Balampanis broke some machines, Rudaj had Nuculovic "pull" Balampanis from next door and bring him to the place where Rudaj and his associates were waiting behind a door.  Rudaj and the others beat Balampanis so badly that there was blood "all over".

Nuculovic's statement to the FBI agents about these events was largely confirmatory of the tape-recorded evidence. Referring to Balampanis, Nuculovic explained that after a Greek man named Tony, who was associated with the Luchese family,

---

[7] The conversation began in the evening of the 15th and ran into the early morning hours of the next day.

broke some gambling machines to show his opposition to the organization's take-over of Queens, Nuculovic lured him to the place where he was beaten by Nuculovic and other organization members.

3.  Count Thirteen and Racketeering Act Five:  Soccer Fever Extortion

The most profitable gambling game in Astoria was the barbout dice game, and the Organization made sure that it had a monopoly on it.  Within months after the Organization had ousted the Luchese family from Queens, the Gambino crime family, represented by Tommy Napoli, tried to open a rival barbout game at a gambling parlor called Soccer Fever.  The Organization forcibly entered the building on the game's second night of operations, tossed over the gaming tables, and attacked one of the Greek gambler-owners of the game, Hirakis.  Ivezaj seized Hirakis and Dedaj beat him.[8]

This extortion of the Soccer Fever victims occurred in August 2001 and was charged as Racketeering Act Five.  The

---

[8] Although the jury found that Nuculovic and others had conspired to extort the Soccer Fever victims, it acquitted Nuculovic and the other defendants of the crime of assault in aid of racketeering based on the attack on Hirakis, a charge brought under 18 U.S.C. § 1959.  Because the Section 1959 charge incorporated New York Penal Law § 120.05, the assault charge required the jury to find that the defendants caused physical injury to Hirakis by means of a deadly weapon or dangerous instrument with the intent to cause physical injury.

possession of firearms during the Soccer Fever incident and in furtherance of the RICO crime charged in Count One was one of the incidents included in Count Thirteen, the firearms count. All defendants were found guilty of Count Thirteen, and the jury found that the Government had proven the extortion charged in Racketeering Act Five.

The jury received first hand evidence about the events at Soccer Fever through Hirakis, who testified at trial.  His medical records were received in evidence, and the defendants' tape recorded reminiscences of the event were also played for the jury.

On a tape recording from April 6, 2004, Rudaj described the Soccer Fever incident to Kyprianou.  He explained that after Nuculovic had helped to get Rudaj and his men into the club, he had looked for Tommy Napoli but didn't find him.  Rudaj then told his men to break the barbout table, and warned the gamblers: "I don't want to see nobody here.  If I see one more time, I swear to God, I say, I beat you fucking one by one.  I eat you up.  It's closed."  Rudaj attributed the attack on Hirakis to Hirakis having disregarded the Organization's warning not to go to Soccer Fever.  About a week later, in a conversation that began on April 15, 2004, Rudaj described again how he had closed Napoli's barbout game and made sure that Napoli didn't put any gambling machines into Astoria.  As

repeated to Kyprianou, he told Napoli when he met with him, "not in Astoria, you know.  This place . . . [is] my place, I say, I control it."

In gripping terms, on April 6, 2004, Ivezaj described what would have happened if any of Napoli's henchmen, who were guarding the barbout game at Soccer Fever, had pulled a gun that night.  "If anybody do anything with guns, they're dead.  If anybody takes a gun out, like you, you have a gun you take out, you get me, or I get you.  That's it."  In another conversation on that same day Ivezaj described dragging Hirakis by his hair and said they hit Hirakis so hard with a chair that it broke.

Nuculovic added to the recorded descriptions of that night. On February 12, 2004, Nuculovic characterized the Soccer Fever incident as an incident directed against Tommy Napoli and not the Greek people, even though Hirakis got hurt.  He admitted to Kyprianou that he had had a gun that night.

When he spoke with the FBI agents, Nuculovic explained that he had personally warned Napoli, who he described as associated with the Gambino crime family, not to open the barbout game at Soccer Fever.  When Napoli went ahead anyway, Nuculovic and other members of his organization shut it down on its first or second day of operations.  The organization's members had gone to Soccer Fever expecting to find Napoli and beat him up, and they all brought guns with them since, as Nuculovic explained,

you couldn't go up against the Gambino crime family unarmed.
Indeed, when the organization first entered the location, the
Italian security guards reached inside their jackets, and
Nuculovic said that he had told them that if they did that,
there would be problems.  Nuculovic said that the organization
then broke up the place, and broke the barbout table.  Two men
also beat a Greek guy named Mike who owed them money, punching
him and then breaking a chair over his head.

Nuculovic added that in response to the Soccer Fever
incident, an underboss of the Gambino crime family named Arnold
summoned Nuculovic and others to a meeting at a gas station in
New Jersey.  At the meeting, Arnold had about fifteen people
with him.  Arnold was told that the organization to which
Nuculovic belonged was taking over Astoria.

The tape recordings played for the jury had similar
accounts of the gas station confrontation which followed the
Soccer Fever altercation.  On October 1, 2003, Nuculovic was
recorded claiming that he had been at the gas station during the
confrontation and had been the person to tell Dedaj to point his
uzi at the gas station pump when the Italians pulled out their
guns.  After Dedaj pointed his gun at the pumps, the Italians
dropped their guns.  When Rudaj described the confrontation in a
conversation with Kyprianou that began on April 15, 2004, he
reported that he feared burning to death when Dedaj pointed his

13

gun at the gas pumps and succeeded in calming Dedaj down and
pulling him away.


4.   Count Twelve and Racketeering Act Twelve:  Cosmos Extortion

      Besides making money from the barbout game and gambling
clubs, the Organization collected money weekly from gambling
machines that they had installed in bars, restaurants, and other
businesses.  When they took over gambling in Queens, the
Organization forced businessmen to accept the Organization's
machines.  The FBI surveilled various combinations of the
defendants as they went on their weekly rounds, usually on
Tuesdays, to collect receipts.  One of the counts as well as one
of the racketeering acts on which Nuculovic was convicted, Count
Twelve and Racketeering Act Twelve, related to the installation
of the Organization's machines in a bar named Cosmos in Queens.

      In a show of force, which included Nuculovic and several of
the defendants, approximately eight men appeared at the Cosmos
bar and demanded that the owner put the Organization's gambling
machine into his bar and have a competing organization's machine
removed.  The bar owner, Nicos Christoforou, testified that he
felt intimidated but not scared by the men.  Christoforou's
bartender corroborated his testimony about these events.  The
Organization's machine was installed, and on December 10, 2003,
in a conversation recorded by Kyprianou, Nuculovic told one of

14

his sons to fix the gambling machine at the Cosmos bar.   The
defendants' machine was seized through a search warrant executed
by the FBI at the Cosmos bar at the time of the defendants'
arrests in the Fall of 2004.

## Discussion

Nuculovic has moved for a new trial based on a claim that
his trial counsel was ineffective.  At a sentencing proceeding
for all six defendants held on June 16, 2006, when it came time
for Nuculovic to address the Court, he complained about the
representation that Koppelman had provided him at trial and in
preparing for the sentencing proceeding.[9]  Nuculovic's sentencing
was deferred, and new counsel was promptly appointed to
represent him.  At a July conference, the Government consented
to Nuculovic filing an untimely motion for a new trial based
solely on the claim that Koppelman had provided ineffective
assistance of counsel.

On September 15, Nuculovic's current counsel filed a Rule
33 motion that was accompanied by a memorandum of law and
lengthy affidavit from Nuculovic.  Many of the factual
assertions which are addressed below are raised solely in
Nuculovic's affidavit.  Nuculovic also filed an affidavit in

---

[9] Apparently referring to the overwhelming evidence at trial,
Nuculovic admitted that he was not suggesting that he was
convicted because of Koppelman's lapses.

reply to the Government's opposition to the motion.  To the extent that Nuculovic's Rule 33 motion is addressed to an ineffective assistance claim based on Koppelman's representation of him, it is addressed in this Opinion and rejected.[10]

Rule 33 authorizes a district court to grant a new trial "if the interests of justice so require."  Rule 33, Fed. R. Crim. P.  A motion for a new trial may be granted only with "great caution and in the most extraordinary circumstances." United States v. Stewart, 433 F.3d 273, 296 (2d Cir. 2006) (citation omitted).  The motion should be granted, however, where there has been a "manifest injustice."  United States v. Snype, 441 F.3d 119, 140 (2d Cir. 2006) (citation omitted).

Motions under Rule 33 are ordinarily required to be made "within 7 days after the verdict or finding of guilty, or within such further time as the court sets during the 7-day period." Rule 33(b)(2), Fed. R. Civ. P.  The time limits in claim-processing rules such as Rule 33 are not "true 'jurisdictional' limitations," but are meant to be strictly enforced.  United

---

[10] In his reply, Nuculovic raises several new issues.  The Court has reviewed carefully all of the issues presented in Nuculovic's Rule 33 motion papers that are addressed to Koppelman's performance in representing Nuculovic, has discussed all of the principal points in this Opinion, and rejects in its entirety Nuculovic's claim that Koppelman provided ineffective assistance of counsel to him.  To the extent that Nuculovic has raised issues that are not encompassed within his claim that Koppelman provided ineffective assistance of counsel, those issues are untimely and unreviewed.

States v. Robinson, 430 F.3d 537, 542 (2d Cir. 2005) (citing

Eberhart v. United States, 126 S. Ct. 403, 404-05 (2005)).

Where the Government does not raise a timeliness objection under

Rule 33, it will be forfeited.  Id.  Here, the Government

consented to Nuculovic filing an untimely Rule 33 motion so long

as it was confined solely to the claim that Nuculovic's trial

counsel was ineffective.

To succeed on an ineffective-assistance-of-counsel claim, a

defendant must demonstrate "(1) that his attorney's performance

fell below an objective standard of reasonableness, and (2) that

as a result he suffered prejudice."  United States v. Jones, 455

F.3d 134, 151 (2d Cir. 2006) (citing Strickland v. Washington,

466 U.S. 668, 687 (1984)).  The performance inquiry examines the

reasonableness of trial counsel's actions under "all the

circumstances."  Greiner v. Wells, 417 F.3d 305, 319 (2d Cir.

2005) (citing Strickland, 466 U.S. at 688), and "from the

perspective of trial counsel at the time," id. (citing Rompilla

v. Beard, 545 U.S. 374, 389 (2005); Strickland, 466 U.S. at

689).  Counsel is "strongly presumed" to have exercised

reasonable judgment in all significant decisions.  Id. (citing

Strickland, 466 U.S. at 690).  Every effort should be made "to

eliminate the distorting effects of hindsight" from the

evaluation of performance.  Id. (citing Rompilla, 545 U.S. at

389).

17

Prejudice forms the second half of an ineffective assistance claim.  The defendant must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Lynn v. Bliden, 443 F.3d 238, 247 (2d Cir. 2006) (citing Strickland, 466 U.S. at 688, 694).  "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Henry v. Poole, 409 F.3d 48, 63 (2d Cir. 2005) (citing Strickland, 466 U.S. at 686).  In assessing the likelihood of prejudice, a court must consider "the totality of the evidence before the judge or jury." Lynn, 443 F.3d at 248 (citing Strickland, 466 U.S. at 695-96).

Before addressing the specific complaints that Nuculovic makes regarding Koppelman, it is appropriate to make some general observations about the quality of Koppelman's trial performance and the issue of prejudice.  To begin with, several of the defendants were well represented at this trial, and Nuculovic was one of them.

Koppelman is a well-known, experienced criminal defense attorney.  He was retained[11] by Nuculovic and appeared for him on

---

[11] Nuculovic is an outspoken, strong-willed individual and had a contentious relationship with his prior counsel, an experienced

May 6, 2005, approximately five months before the trial began.
By the time of trial, Koppelman had sufficiently mastered the
charges and the Government's discovery materials that he was
well prepared to defend Nuculovic.  He had a coherent strategy
which he employed throughout the trial in an effort to undermine
the Government's case against his client.  Many of the themes
that he pursued were presented in his opening statement.  His
cross-examinations of the Government witnesses were nimble,
aggressive, and skillful, reflecting thorough familiarity with
the trial record and the Section 3500 material.  His jury
addresses were organized, thoughtful and pointed.  He objected
frequently during the trial and argued numerous evidentiary
issues and mistrial motions with vigor.  Although several of the
defense attorneys were well-versed in the law and collectively
raised a spate of legal issues, Koppelman was responsible for
identifying several of the more significant issues.

　　While an attorney's ability to obtain a hung jury or
acquittal for his client is not a reliable measure of the
quality of advocacy, since the evidence received at trial is
almost invariably the key factor driving a jury's verdict, it is
nonetheless noteworthy that Koppelman obtained several verdicts
in Nuculovic's favor.  Nuculovic was acquitted along with his

---

member of this Court's CJA panel and an exceptionally talented
trial attorney.

co-defendants of assaulting Hirakis in aid of the racketeering crime charged in Count One, of committing an extortion at the Grecian Cave, and of making an extortionate extension of credit in the amount of $10,000.  Nuculovic was the only defendant charged in these last two offenses and no other defendant obtained as many separate verdicts in his favor.[12]

Turning to the second prong of the ineffectiveness inquiry, Nuculovic has utterly failed to address the issue of prejudice. The Government's evidence on each of the counts on which he was convicted was overwhelming, and much of it was irrefutable. Seized evidence, surveillance photographs, and tape recorded conversations constituted compelling evidence of the Organization's  membership, violence, territory, and scope of operations.  As described above, Nuculovic, Rudaj or both of them were recorded describing events that were critical to the key charges on which Nuculovic was convicted.  On top of that, Nuculovic's own statements to the FBI agents on the eve of his arrest confirmed his complicity in these crimes.

In sum, there is no reason to believe that the verdict would have been any different had Nuculovic been represented at trial by other counsel or that it represents anything other than a just result.  In any event, Nuculovic was ably represented at

---

[12] As already noted, the only other charge on which other defendants prevailed was the racketeering charge that Rudaj and Colotti had attempted to murder Gaetano Peduto.

trial and has no good faith or reasonable basis to claim that he was deprived of effective assistance of counsel.  An analysis of Nuculovic's specific complaints about Koppelman follows.

1.  Trial Counsel Slept During the Trial.

Nuculovic asserts that Koppelman slept through portions of the trial.  As stated above, ineffective assistance of counsel claims generally require a showing of both the performance and the prejudice prongs of the Strickland test.  There are, however, "circumstances so severe as to constitute per se violations of the Sixth Amendment."  United States v. O'Neil, 118 F.3d 65, 70 (2d Cir. 1997).  "Where a defendant establishes a per se violation of his right to counsel, he need make no further showing in order to obtain relief."  Id. at 71.

The Second Circuit has had "many occasions to consider whether circumstances warrant application" of the per se rule, but has to date applied it explicitly in only two situations: when, unknown to the defendant, counsel was not duly licensed to practice law, or when the attorney is implicated in the defendant's crimes.  United States v. Rondon, 204 F.3d 376, 379-80 (2d Cir. 2000).  In addition, where defense counsel is "repeatedly unconscious at trial for periods of time in which defendant's interests were at stake," the Court of Appeals has found that the defendant "suffered prejudice, by presumption or

otherwise," since in such circumstances there has been a breakdown in the adversarial process on which our system relies to produce a just result. Tippins v. Walker, 77 F.3d 682, 687 (2d Cir. 1996). While episodes of inattention or slumber are ordinarily "perfectly amendable" to analysis under the two-part Strickland test, id. at 686, at some point prejudice is inherent "because unconscious or sleeping counsel is equivalent to no counsel at all." Id. (citing Javor v. United States, 724 F.2d 831, 834 (9th Cir. 1984)); see also Rondon, 204 F.3d at 379-80.

Nuculovic asserts that Koppelman "slept through portions of every trial day," usually after 11:00 a.m., sometimes for a few minutes, and at other times "for extended periods." According to Nuculovic, he would jostle Koppelman whenever he noticed him sleeping, and a co-defendant and the Court's staff also woke Koppelman up. He asserts that, as a result of Koppelman sleeping, Koppelman failed to object to crucial evidence, to formulate a coherent trial strategy or conduct effective cross-examination.[13] Nuculovic has not identified any particular

---

[13] Nuculovic also observes that he did not "fully understand" what was said "at times" at trial since English is not his native language. It is not clear whether Nuculovic makes this assertion to point out that he could not describe to Koppelman what he had missed when he was sleeping or to argue that Koppelman was unable to discuss portions of the trial with Nuculovic because he had been asleep during it. In any event, this is an entirely specious contention. Apart from the fact that Koppelman did not miss any material portion of the trial proceedings, Nuculovic himself was entirely capable of

portion of the testimony that Koppelman purportedly missed.
With the exception of one incident which is addressed below,
Nuculovic has also not identified any objection that Koppelman
should have made, strategy he should have developed, or cross-
examination he did not undertake because he slept through
testimony.

Nuculovic has greatly distorted Koppelman's trial behavior.
At the very beginning of the trial, which was largely devoted to
agent testimony about gambling machines and paraphernalia that
had been seized and the agents' surveillance of the defendants
as they traveled through Astoria collecting money from their
gambling machines, it appeared at times that Koppelman had been
sleeping.  As the Court observed when discussing this matter on
October 18, there were others in the courtroom who may also have
been tempted to sleep during that time, given the tedium
associated with this largely uncontroversial proof.[14]

On October 12, after the presentation of contested evidence
began and after customary measures to address the situation had

understanding English.  At no time in this prosecution has
Nuculovic indicated either a need for an interpreter or
difficulty understanding or speaking English.  He spoke fluent
English in the many recordings of his conversations that were
played during the trial.

[14] Many of the defendants conceded the gambling charges in their
opening statements.  Somewhat surprisingly in light of those
concessions, several defense counsel nonetheless chose to cross-
examine the stream of Government agents who testified to the
seizures and surveillances.

been tried and appeared to be inadequate, the Courtroom Deputy
told Koppelman that the Court would take steps to make sure that
he was awake at any time he appeared to be sleeping.  At the
beginning of the next trial day, October 17, the Court described
the instructions that had been given to Koppelman and noted that
it had had to intervene with Koppelman once on October 12.

At the end of the trial day on October 18, the Court
returned to the subject and noted that since it had placed the
issue on the record it did not appear that the problem was
occurring to the degree it had in the past.  The Court suggested
that Koppelman sit up straight to help stay awake and focused.
Koppelman is an older gentleman who frequently listened to the
testimony by lounging back in his chair, resting his head on the
back of the chair, putting his knee up against the table, and
closing his eyes.  The Court observed that it would be watching
carefully to make sure that Koppelman was awake and that it had
noticed others around him giving him a nudge at times to help
him stay awake.

Koppelman immediately moved for a mistrial, stating "if
your Honor thinks that I have been asleep through significant
portions of this trial to the extent that my client has not been
properly represented, then perhaps a mistrial is in order for
his benefit."  The motion was denied, with the observation that
the Court was creating a record for two purposes:

> I'm trying to protect your client's rights and protect the
> integrity of this trial process.  I do not want to be faced
> with a motion at some later date when my recollection of
> what's proceeded here is less acute.  I want to be in a
> position to create a record with respect to these issues
> when I can fairly describe what I have observed and what I
> believe is going on.

As the Court explained,

> part of the problem is you slouch in your chair and put
> your head on the back of your chair and close your eyes.
> So sometimes you may just be listening in a relaxed state
> and it's hard for me to assess.  But I am taking the
> conservative approach here, and if I look and see you in a
> position in which you might be asleep, we take action.

Koppelman then denied that he had been sleeping through

significant portions of the trial:

> I have not been sleeping through significant portions of
> this trial.  I do not say that I was awake every moment,
> Judge, but I don't know how your Honor can tell the
> difference between me leaning back in my chair with my eyes
> closed and sleep.  If I was snoring, Judge, then you could
> probably tell.  I don't think anybody has claimed that I
> have been snoring through any of this trial.

He denied that he was engaging in a ploy to create a mistrial.

The Court made clear that it had not found that he had been

sleeping "during any significant portion of the trial."

During the trial, a number of strategies were employed to

help all participants stay attentive.  In addition to morning

and afternoon recesses, there were frequent "stretching breaks",

in effect a recess in the proceedings so that everyone in the

courtroom could stand in place for a few minutes and stretch.

The blinds were drawn when the sun was shining, the courtroom

was kept fairly cold, and jurors were encouraged to bring
sweaters and scarves to help everyone stay alert.  The Courtroom
Deputy provided pitchers of ice water to Koppelman daily,
beginning in mid-October.  Koppelman persisted in lounging back
in his chair on occasion and closing his eyes, and when he did
so Nuculovic or Colotti, who sat on Koppelman's other side,
would nudge him, or the Courtroom Deputy or a law clerk would
ask Koppelman to sit up.[15]

The issue was discussed for a third and final time on
October 27.  That day, when the law clerk approached him and
quietly asked him to sit up, Koppelman had responded, "I can't
cross my legs, is that what you're saying?"  He refused to alter
his position or put his knee down.  At the next recess, the
Court described the interchange and then observed that Koppelman
was most inclined to fall asleep or appear to fall asleep when
he was sitting back in a lounging position with his knee up,
resting against the table.  On "several prior occasions" during
the trial, the Court's staff had asked him to put his knee down

---

[15] The Court's staff acted quietly and discreetly.  The law
clerk's seat in the courtroom was just steps from the end of the
table where Koppelman was seated.  The Deputy regularly walked
in and out of the courtroom to attend to court business.  They
were able, therefore, to approach Koppelman without drawing
undue attention to the issue.  While Nuculovic did on occasion
assist in the effort to get Koppelman to sit upright and open
his eyes, at some point mid-way through the trial, Nuculovic
stopped doing so and in fact refused to help the Court's staff
when requested to do so.

and to sit up.  The Court explained that the intent was not to police posture but to help him "stay alert and participate" in the trial.  The Court explained,

> I have never had to do this in a trial before.  It gives me no joy.  It certainly gives my staff no joy.  I would ask you in the future, sir, please, when asked to put your knee down and to sit up, do so.  We are doing it not because I care about people's posture in the courtroom but because it is very important to me that you are awake and alert during these proceedings so that you can represent your client adequately.

Koppelman protested that he had been awake, and made no other observation.

As noted, there were no other discussions on the record after October 27 about this problem.  The Court continued to watch the situation carefully, and whenever Koppelman leaned back in his chair and closed his eyes for more than a few moments, he was discreetly asked to sit up.[16]  As a consequence, there is absolutely no basis whatsoever to find that Koppelman

---

[16] Koppelman's refusal to comply with the Court's request in mid-October that he not lounge back in his chair and close his eyes deserves some comment.  Koppelman did not appear to be in the best of health, and took occasional breaks to attend to his personal needs.  Whether his resistance to following the Court's request was due to illness or stubbornness, or a combination of both is difficult to assess.  Before the jury, Koppelman generally adopted a respectful, reasonable, and even ingratiating tone.  Outside the presence of the jury, he showed another aspect of his personality.  He was strong-willed and irascible, losing his temper easily and too frequently.  While his co-counsel cooperated with each other, Koppelman chose to pursue his own course and go his own way.  Whatever the motivation was for his defiant behavior, steps were taken to ensure that he did not sleep during the trial proceedings.

slept through any appreciable portion of the trial following the agent testimony given in the trial's opening days.  Even during those early days, Koppelman was a careful observer of the proceedings and an active participant, conducting some of the most memorable cross-examinations of the stream of agent witnesses.

As already noted, Koppelman had a well-defined strategy for the trial, which he pursued effectively throughout the trial. His cross-examinations were skillful, imaginative, and based on a thorough command of the trial testimony.  Nuculovic has not pointed to any deficiency in either regard based on a lack of familiarity with the trial record.  Nuculovic has identified only one instance where Koppelman should have lodged an objection, but failed to do so.

During the summation for co-defendant Ivezaj, his attorney argued that the Government did not have sufficient corroboration for its charges, and in particular that there was insufficient corroboration of the events that Nuculovic and the other defendants had described to Kyprianou in conversations that Kyprianou recorded.  In making this point the attorney displayed certain Government trial exhibits, including pictures of his client and others attending the John Gotti funeral.  When he showed the picture of Nuculovic attending the funeral, he argued

28

that all that the picture demonstrated was that Nuculovic was a "wannabe."

There is absolutely no basis to find that Koppelman was inattentive during any of the summation, much less at that particular moment. Moreover, Nuculovic has not shown that an objection would have been appropriate, much less wise. The summation argument referred to evidence before the jury and tried to minimize its impact. An objection would have done little but highlight the photograph further for the jury. In any event, the argument about the photograph was not that different from the arguments made by Koppelman and each of the other defense counsel. Each of them conceded to the jury, in the face of overwhelming evidence, that the defendants were running a gambling organization; they focused their defenses on the more serious of the Government's charges.

As for Nuculovic's contention that the jury did not take his case seriously, that could not be further from the truth.[17]

---

[17] Nuculovic claims that he saw the jury smiling when they heard Koppelman snoring. He fears that the jury did not take his case seriously because they saw that Koppelman did not care and was not paying attention. It was obvious to one and all in the courtroom that Koppelman cared intensely about Nuculovic and the charges against him, and that he was working hard in presenting a defense. The jury gave Koppelman its full attention whenever he questioned witnesses or addressed the jury. Moreover, it is unlikely that the jury was even able to observe Koppelman when he was not on his feet. The well of the courtroom was extremely crowded, with four rows of tables to accommodate counsel and the defendants. Koppelman and Nuculovic were seated at the second

Koppelman worked hard to create and maintain a good rapport with the jury, and there is every indication that he succeeded in doing so.  They were attentive to his examinations and his jury addresses.  Koppelman succeeded in convincing the jury to reject three of the Government's charges against Nuculovic, more than any other defendant achieved.

In sum, as a result of steps that were taken following the opening days of the trial, the Court is able to find with confidence that Nuculovic's assertion that he was prejudiced because his attorney slept during his trial is without foundation.  This prong of the Rule 33 motion is rejected.


2.  Trial Counsel Failed to Consult with Nuculovic During the Trial.

Nuculovic contends that his attorney did not visit him in jail during the trial, discuss the case with him during the luncheon recess or other breaks, or review the discovery materials with him before the trial.  Nuculovic asserts that with more opportunity to talk with Koppelman, he could have told

---

table, at the far end from the jury.  Four other men at that table sat between the jury and Koppelman.  Five individuals sat at the table behind Nuculovic's table.

him of impeachment material on Balampanis,[18] Hirakis,[19] and

Christos Vrahimes, a manager at the Grecian Cave.

As the Honorable Jack B. Weinstein has observed,

"[a]dequate consultation between counsel and client is essential

to the competent representation of a criminal defendant."

Jelinek v. Costello, 247 F. Supp. 2d 212, 272-73 (E.D.N.Y.

2003).  Nuculovic's claim that Koppelman did not consult with

him, however, is absolutely wrong.  The trial lasted for over

three months and Koppelman and his attorney sat next to each

other throughout the trial.  They were frequently observed

consulting with each other during the trial.  As the Government

notes, even if it is true that Koppelman did not consult with

Nuculovic at length before the trial, for the first month of the

trial, very little of the evidence directly concerned Nuculovic,

and he had ample opportunity to provide any information to

Koppelman that he believed would be of assistance in his

defense.

---

[18] Nuculovic asserts that Balampanis was a violent person who had
been involved in fights at the Sirocco Club and Grecian Cave,
and that he was Albanian and not Greek, as he claimed at trial.
In his trial testimony, Balampanis admitted that he had punched
a person.  The tape recordings played at trial presented the
defendants' view of his nationality to the jury.

[19] Nuculovic asserts that Hirakis is an alcoholic and drug
addict.  Hirakis was confronted with similar accusations during
cross-examination.

Koppelman conducted vigorous, effective cross examinations of both Balampanis and Hirakis, and successfully defended Nuculovic on the Grecian Cave extortion charge,[20] a racketeering act brought against Nuculovic alone.  The evidence that Balampanis and Hirakis were each beaten as the Organization cemented its control of Astoria gambling was beyond dispute since Rudaj and others described those beatings and their take-over of Astoria in tape recorded conversations.  Despite the hurdles that the tape recordings placed in their way, Koppelman (and other defense counsel) conducted skillful examinations of the Government's witnesses and, among other things, won an acquittal on the assault charge associated with the Hirakis beating.  Therefore, Nuculovic's ineffective assistance of counsel claim based on a failure to consult must fail.

3.  Trial Counsel Failed to Investigate the Charges.

Nuculovic contends that Koppelman did not adequately investigate the charges.  The principal issues that Nuculovic raises in this connection concern the beatings of Balampanis and Hirakis.

---

[20] Nuculovic makes several claims about Koppelman's failures in regard to the Grecian Cave charge.  None of them are meritorious.  Because the jury acquitted Nuculovic of the charge concerning the Grecian Cave, it is unnecessary to discuss Nuculovic's assertions regarding the Grecian Cave issues further.

Defense counsel has a duty to investigate, which "requires counsel to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Greiner, 417 F.3d at 320-21 (citing Strickland, 466 U.S. at 691). "It does not, however, compel defense counsel to investigate comprehensively every lead or possible defense." Id. at 321. Where there is "reason to believe investigations would be fruitless or even harmful," the failure to conduct the investigation may not be challenged as unreasonable. Id. (citing Strickland, 466 U.S. at 691).

With respect to Balampanis, Nuculovic asserts that Koppelman should have inspected the scene of the Balampanis beating to see that it was too small to hold all of the attackers who Balampanis said participated in the attack. This contention is frivolous. The Balampanis beating, including Nuculovic's role in luring him to the scene, is described by the defendants on the tape recordings, and Balampanis conceded that the hallway where it happened was small.

With respect to Hirakis, Nuculovic first asserts that Koppelman should have visited the Sirocco nightclub, which Hirakis identified as the location where he was photographed wearing a particular watch. Nuculovic asserts that Koppelman would have learned that the Sirocco didn't have a basement. The picture and where it was taken are collateral matters far

removed from the issues on which the jury's verdicts were based. Koppelman examined Hirakis at great length and vigorously. That examination laid a more than sufficient foundation for Koppelman to argue to the jury, as he did in summation, that Hirakis' testimony about the watch and his financial transactions with Nuculovic was unreliable.

Nuculovic next contends that Koppelman should have located among the tape recordings an exculpatory conversation in which Hirakis admits that no guns were used in the attack on him and that he was beaten because he owed gambling debts. This argument is frivolous. In other tape recorded conversations played for the jury the defendants describe Hirakis being beaten with a chair. The jury heard Nuculovic's own statement that Hirakis was beaten because he owed money. In any event, the vigorous cross-examination of Hirakis sowed sufficient doubt about either the method or motive in the Hirakis beating that the jury acquitted the defendants of the assault charge linked to that beating.

Nuculovic also makes several assertions about individuals who could have disclosed information to Koppelman that may have been helpful in some way or the other. In the absence of affidavits from these witnesses, it is unnecessary to analyze either the relevance of the asserted information to the trial evidence or its materiality.

Finally, Nuculovic asserts that an expert examination of the tape recorded conversations, most of which were digital recordings, would reveal that they had been doctored before being given to the defendants.  Nuculovic has new counsel.  If there were any merit to this contention, then it should have been supported by an expert affidavit.  All of the defendants had the ability to pursue expert examination and testimony in this regard.  Nuculovic has not shown that his counsel was ineffective for failing to do so.  Altogether, Nuculovic's ineffective assistance claims based on failure to investigate are rejected.


4.  Trial Counsel Failed to Call Witnesses.

In his fourth and final argument, Nuculovic asserts that Koppelman should have called several witnesses during the trial. He has not shown that Koppelman provided ineffective assistance to him in this regard either.

"The decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial."  United States v. Smith, 198 F.3d 377, 386 (2d Cir. 1999) (citation omitted).  The reasonableness of such a tactical decision is judged "in terms of the adequacy of the investigations supporting it."  Gersten v. Senkowski, 426 F.3d

588, 609 (2d Cir. 2005) (citing <u>Wiggins v. Smith</u>, 539 U.S. 510,
521 (2003)).

> Strategic choices made after thorough investigation of law
> and facts relevant to plausible options are virtually
> unchallengeable, and even strategic choices made after less
> than complete investigation do not amount to ineffective
> assistance -- so long as the known facts made it reasonable
> to believe that further investigation was unnecessary.

<u>Henry</u>, 409 F.3d at 63 (citing <u>Strickland</u>, 466 U.S. at 690-91).

First, Nuculovic asserts that Koppelman should have called
Hirakis to testify.  Hirakis testified for approximately eight
days, much of that time under vigorous cross-examination.
Nuculovic has not shown that there was any failure in judgment
in not recalling him to the stand.  As already described, the
jury acquitted the defendants of a key charge linked to the
beating of Hirakis.

Nuculovic asserts that Koppelman should have called Kostas
Panzialis to testify that Balampanis had beaten him.  Balampanis
admitted that he had attacked Panzialis, and there is no showing
that testimony from Panzialis himself about the beating would
have been either admissible (since it would have been collateral
evidence regarding an issue of credibility) or anything other
than cumulative.

Nuculovic complains that Koppelman did not call Dimopoulos
to testify.  Dimopoulos was unavailable as a trial witness since

his attorney represented that he would invoke his Fifth Amendment privilege if called as a witness.

Finally, Nuculovic contends that Koppelman should have called Paloka Vulaja, a/k/a Paulie the Albanian, to testify that Dimopoulos was in hiding because he owed Paulie a gambling debt. Nuculovic has not presented any affidavit from Vulaja representing what testimony he would have given if called as a witness at trial. In any event, such testimony would not have been exculpatory or created any reasonable doubt given the overwhelming evidence of the Organization's violent takeover of gambling in Astoria from the Luchese crime family and their representative Dimopoulos. Therefore, Nuculovic has failed to show an ineffective assistance claim for failure to call witnesses.

## Conclusion

Nuculovic's motion for a new trial pursuant to Rule 33, Fed. R. Crim. P., is denied.

SO ORDERED:

Dated:    New York, New York
          December 12, 2006

_DENISE COTE_
United States District Judge